[No. 5370.]

LOREN COBURN v. JOSEPH P. AMES AND ELLEN TEMPLETON, ADMINISTRATRIX OF THE ESTATE OF HORACE TEMPLETON, DECEASED, CHARLES GOODALL, CHRISTOPHER NELSON, AND GEORGE C. PERKINS.

EVIDENCE IN ACTION TO CONDEMN LAND FOR ROAD. — If an act for the condemnation of land for road purposes requires the Board of Trustees of the township, after the damages are ascertained, to draw a warrant for the same upon the Road Fund, in favor of the Clerk of the Board of Supervisors, and to cause the same to be paid, and the money to be transmitted to said Clerk, to be by him paid to the parties entitled thereto, the party seeking to condemn land must prove that there were funds in the treasury, applicable to that purpose, when the warrant was drawn; for if it can be presumed that the officers did their duty, there is no presumption that there was money in the treasury applicable to that purpose.

PAYMENT OF DAMAGES ON OPENING A ROAD.—The point not decided whether, in a proceeding to condemn land for a road, a deposit of the damages awarded the owner of the land with the Clerk of the Board of Supervisors, for the owner, as required by a statute, is equivalent to a payment of the damages.

TRESPASSING ON PUBLIC HIGHWAY.—The use of a public highway for storing merchandise is not the use of the same as a public easement, and the persons who thus use it are trespassers.

EJECTMENT FOR A HIGHWAY.—The owner of the fee of the land, subject to an easement over the same for a public highway, may maintain ejectment against an intruder who takes possession of it and uses it for other than road purposes.

DAMAGES FOR OBSTRUCTING A HIGHWAY. — The owner of the fee of the land over which a public road has been established may, if he suffers special damage from an obstruction of the same, beyond that suffered by the public, maintain an action for damages, and to abate the nuisance.

IMPROVEMENTS ON OR APPURTENANCES TO LAND OR FIXTURES. — If a lease is given of land on the shore of the ocean, extending down to low-water mark, and the lessee constructs a wharf from the shore extending into the water beyond low-water mark, that portion of the wharf beyond low-water mark is not an improvement on the demised premises, nor appurtenant thereto, nor is it affixed to them in the sense of the statute, even if attached to the wharf on the demised premises by nails, bolts, and screws.

RIPARIAN PROPRIETOR. — The point not decided whether, at common law, a riparian proprietor can wharf out from his land into deep water.

OBSTRUCTIONS IN NAVIGABLE WATERS.—The title to the bed of the ocean below low-water mark, along the shore, is in the State, and if obstructions are placed in it which obstruct navigation and fishery, they may be abated as public nuisances at the suit of the State.

EJECTMENT FOR A WHARF. — The State may maintain ejectment for a wharf constructed without authority beyond low-water mark.

CONSTRUCTION OF LEASE.—A lease of a tract of land on the sea-shore extending down to low-water mark, with a clause that, at the expiration of the

term, the lessees shall surrender the demised premises, does not compel the lessees to surrender to the lessor a wharf beyond low-water mark which they have constructed during the term, and which is attached to a wharf on the demised premises.

EJECTMENT BY RIPARIAN PROPRIETOR.—If a wharf is constructed over the land of a riparian proprietor, extending beyond low-water mark into deep water, he cannot maintain ejectment for that part of the wharf extending beyond low-water mark into the ocean.

APPEAL from the District Court, Twelfth Judicial District, County of San Mateo.

The demanded premises were at Pigeon Point, in the County of San Mateo. The complaint contained two counts, one averring right of possession in the plaintiff, and ouster on the 27th of September, 1872; while the other placed the date of the ouster on the 2nd day of October, 1872.

On the 1st day of September, 1862, the plaintiff and Jeremiah Clarke were the owners in fee of a large tract of land known as the Punta del Año Nuevo, extending along the Pacific Ocean for ten or eleven miles. The land sued for was a part of this tract, and extended along and was bounded by the ocean for a distance of two hundred feet on each side of the wharf hereinafter described.

On the first day of January, 1863, Clarke and the plaintiff, by a written lease executed on that day, demised to James Brennan a parcel of land of forty acres at Pigeon Point, portion of the said larger tract. The land sued for is a portion of this forty-acre tract. The rent was mentioned in the lease, and the letting was on the terms and conditions, among others, that the lessee was, at the end of the term, to surrender to the lessors or their assigns the land so leased, with such improvements as shall have been erected or made thereon, in good repair and condition. The term ended on the 1st day of October, 1872.

Brennan, the lessee, took possession of the demised premises under the lease, and remained in possession until some time in November, 1867, when all his rights under the lease passed to and were acquired by the defendants, Goodall & Nelson, who entered into possession of the premises in said month, as successors in interest of said lessee, and continued in possession until the end of the term. While so in possession, Goodall &

Nelson paid rent to the plaintiff, who had before the said month of November become the assignee of Clarke's interest in the lease and term.

The lessee, while he was in possession, and Goodall & Nelson, while they were, used the land demised for receiving and storing lumber, grain, hay, etc., to be shipped, and shipped said articles therefrom ; and also for landing and depositing thereon articles of freight from vessels coming to the place.

Some time before the 16th day of November, 1871, Thomas W. Moore and Horace Templeton, (the intestate of defendant Ellen Templeton) with the consent of Goodall & Nelson, built the wharf and chute mentioned in the complaint.

Moore and Templeton, on the 16th day of November, 1871, conveyed to defendant Ames an undivided half of the wharf and chute, and since such structures were completed, in 1871, they have been used for shipping purposes.

Moore and Templeton erected the wharf and chute under an order of the Board of Supervisors of San Mateo County.

The wharf and chute were one connected structure, and built from the shore on the demised premises beyond low-water mark, into the ocean.    The wharf is imbedded in the dry land, and as it extends into the ocean rests on posts driven into the soil.    The portion of the same beyond low-water mark is about one hundred feet in length.    The chute was attached to the end of the wharf.    The wharf was about twenty feet in width.    Moore & Templeton presented the petition to the Board of Supervisors for leave to build the wharf on the 3rd day of October, 1870, and the Board made the grant on the 27th day of the same month.

This grant was made by virtue of authority conferred upon the Boards of Supervisors of this State by the Legislature. The lessors did not consent to the building of the wharf or chute.    The plaintiff contended that owing to some irregularity and also to a mistake in the description of the land where the wharf was built, the grant was void.    The application to build the wharf is the same that was passed on by this Court in *Templeton* v. *Coburn* (48 Cal. 563).    On the 5th day of July, 1870, proceedings were commenced before the Board of Supervisors

of San Mateo County to open and establish a road from Bulano Bridge, near Pescadero, to the southern line of the County, which road in its course crossed the land in controversy at the landward end of the wharf. The proceedings were carried through, and the damages of the lessors were assessed at four hundred dollars. On the 3rd day of March, 1873, proceedings were instituted to open another road from said bridge to the southern line of the county, which crossed the end of the land in controversy most distant from the ocean, and these proceed: ings were also carried to a termination. On the same day proceedings were also commenced to open another road commencing at high-water mark on the wharf and running in a northwesterly direction across the land in dispute until it intersected the second road here spoken of, and these proceedings were carried to a termination. The damages of the lessors were assessed in each case. The manner in which these damages were attempted to be paid is related in the opinion. The proceedings to open these roads were instituted by defendant Ames.

The Court gave judgment for the plaintiff for the land, and wharf, and chute. The defendants appealed. The other facts are stated in the opinion.

*Campbell, Fox & Campbell*, for the Appellants.

The proceedings of the Board of Supervisors, in laying out these roads, and in granting the franchises under which defendants claim the wharf, might have been made the subject of review, in proper time, but cannot be attacked collaterally. (*Thomas* v. *Armstrong*, 7 Cal. 287; *Waugh* v. *Chauncey*, 13 Cal. 11; *Fall* v. *Payne*, 23 Cal. 302; *People* v. *El Dorado County*, 8 Cal. 58; *People* v. *Marin County*, 10 Cal. 344.) The wharf and chute were built over the overflowed and submerged lands of the State, and the plaintiff is not entitled to recover them by reason of his ownership of the land in front thereof. (*Stevens* v. *Patterson, etc.*, 34 N. Y. L. 532; *Tomlin* v. *Dubuque R. R. Co.* 32 Iowa, 106; *Lockwood* v. *N. Y. &c. R. R. Co.* 37 Conn. 387; *Austin* v. *Rutland P. R. R. Co.* 45 Vt. 215.) Nor could he maintain the wharf, or exercise the

franchise, if he had it in possession. (*Monroe* v. *Thomas*, 5 Cal. 470 ; *Thomas* v. *Armstrong*, 7 Cal. 286 ; *Wood* v. *Truckee Turnpike Co.* 24 Cal. 486 ; *Wiswell* v. *Hall*, 3 Paige, 314 ; Angell & Ames on Corporations, sec. 4 ; *People* v. *Duncan et als.* 41 Cal. 507 ; *Bank of Augusta* v. *Earle*, 13 Peters, 595.) Being established upon the public domain, no one but the State can recover it, even if established without authority of law, or complain of our use of it. (*Harris* v. *Thompson*, 9 Barb. 361 ; *Varick* v. *Smith*, 5 Paige, 137 ; *Stiles* v. *Hooker*, 7 Cowen, 266 ; *Russell* v. *Men of Devon*, 2 Term R. 660.) If a nuisance, the taking of the possession from one and giving it to another will not operate as an abatement. But being established by public authority, it cannot be abated as a nuisance, even if a recovery by plaintiff would operate as an abatement. (*Harris* v. *Thompson*, 9 Barb. 361 ; *Charles River Br. Co.* v. *Warren Br. Co.* 11 Pet. 420 ; *Renwich* v. *Morris*, 3 Hill, 621 ; *Culkin* v. *Brown*, 2 Wend. 667 ; *Queen* v. *G. N. & E. R. Co.* 9 Ad. & E. 315.)

*Delos Lake*, for the Respondent.

The owner of land bordering on the ocean, or its bays, inlets, creeks, rivers, etc., has the exclusive right of building landings, wharves, or piers out from his land into waters sufficiently deep for the accommodation of commerce. No one else has that right. We say nothing here of privileges which may be acquired by others by the legal exercise of the rights of eminent domain.

Angell on Tide Waters says (p. 171, ed. 1847) : " Riparian proprietors, it appears to be well settled, *cannot be cut off from the water, against their consent, by any extraneous addition to their upland.*" And he cites for this *Ball* v. *Slack*, 2 Whart. (Penn.) R. 538 ; and *Cortelyou* v. *Van Blunt*, 2 Johns. 257. It cannot matter of what such extraneous addition consists, whether of wharf or other obstruction.

In *Bowman's Devisees* v. *Waltham*, (2 McLean's Rep. 376) which was a case arising out of rights on the Ohio River, but which the Judge puts on the same footing as navigable tide

waters, the learned Judge says "that the riparian right on the Ohio River extends to the water, and that no supervening right over any part of this space can be exercised or maintained without the consent of the proprietor. He has the right of fishing, of ferry, and *every other right* which is properly appendant to the owner of the soil ; and he holds every one of these rights by as sacred a tenure as he holds the land from which they emanate." (*Harrison* v. *Storritt*, 4 Har. & McH. R. 540 ; *Harrison* v. *Edwards*, 17 Wis. 604.)

*Williams & Thornton*, also for the Respondent.

In every State of the Union it has been held, we believe, that, as proprietor of the adjoining land, the owner has the right of exclusive access to and from the body of water at that particular place ; and all the facilities which the location of his land with reference to the body of water affords he has the right to enjoy for purposes of gain or pleasure.

He has the right of access, exclusive of other persons, from his land over the shore to navigable water. ( *Clark* v. *Peckham*, 10 R. I. Rep. 35 ; *Thornton* v. *Grant*, 10 R. I. Rep. 477 ; *Dutton* v. *Strong*, 1 Black, 23 ; *Delaplaine* v. *The Chicago etc. R. R. Co.* ; Pacific L. Rep. October 9th, 1877.)

It is admitted that the legal title to the shore, and—for the purposes of this argument—to the land below low water-mark, within the three marine miles, is in the State of California ; but such title does not impair or conflict with the property of the riparian proprietor. The latter has the right, even against the State, not interfering with the rights and conveniences of navigation, to the possession, use, and enjoyment of all in front of his land to navigable water. He has a right to build there wharves, chutes, or even to fill it up by solid embankment to deep water ; *provided*, he does not interfere with commerce and navigation. (*Gough* v. *Bell*, 2 Zaluskie, 441 ; *Kingman* v. *Sparrow*, 12 Barb. 201 ; *Hart* v. *Hill*, 1 Mart. 135 ; *Chess* v. *Manown*, 3 Watts, 219 ; *Bird* v. *Smith*, 8 Watts, 434 ; *Cooper* v. *Smith*, 9 S. & R. 26 ; *Chambers* v. *Ferry*, 1 Yeates, 167 ; *Shunk* v. *Schuylkill Co.* 14 S. & R. 71 ; *Bartlett* v. *Common-*

*wealth*, 17 Penn. St. 206; *Lehigh Valley Railroad* v. *Trone*, 23 Penn. 206; *Frytag* v. *Powell*, 1 Whart. 536; Ang. on Tide Waters, 235; 3 Kent Com. 430.)

The owner of uplands adjacent to navigable waters has an interest in the shores, of which he cannot be deprived, even by the sovereign power, without compensation (see 2 Am. Lead. Cases, 224); and the cases are numerous among those cited where, for infringing such rights, actions of various kinds, including actions of *ejectment* and trespass *quare clausum fregit*, have been maintained by the riparian owners, especially when the soil between high and low-water mark has been reclaimed by the erection of *wharves* or the filling up of flats. (See *Nichols* v. *Lewis*, 15 Conn. 143.)

A wharf built in virtue of an appurtenant right is an appurtenance. In the opinion of the Supreme Court of the United States, in *Harris* v. *Elliott*, 10 Peters, 54, it is said: "This term, both in common parlance and in legal acceptation, is used to signify something appertaining to another thing as principal, and which passes as an incident to the principal thing."

By the Court, CROCKETT, J.:

The action is ejectment for six acres of land lying on the shore of the Pacific Ocean, and for a wharf and chute projecting from the mainland out to deep water—a considerable distance below low-water mark. The plaintiff's title and right of possession to all the land above high-water mark are not contested, except in respect to certain portions thereof, which, it is claimed, constitute public highways, over which the defendants, in common with the public, have a right of way.

The defendants contend, first, that at the commencement of the action they were not in the possession of any portion of the land above high-water mark; second, that so much of the wharf and chute as is below high-water mark was erected by two of the defendants at their own expense, under competent authority first had from the Board of Supervisors, after appropriate proceedings for that purpose; and, further, that said wharf and chute are not upon the plaintiff's land, nor affixed or appurten-

ant thereto, and that he has no right to the possession thereof; third, that as to the highways, they were only using them as such, as they lawfully might, in common with the public.

Without attempting an analysis of the evidence in respect to the possession of the defendants at the commencement of the action, it will suffice to say on this point that there was evidence tending to show such possession, and the judgment will not be disturbed on the ground that in this particular it was not justified by the evidence.

In respect to the highways the plaintiff contends and the Court finds that the damages awarded to the owners of the land have not been paid to them or deposited for them with the Clerk of the Board of Supervisors, as required by the statute; and as a conclusion of law the Court finds that the highways were not legally established. These findings of fact are attacked by the defendants, on the ground that they are not supported by the evidence. The proceedings to establish the road from Butano Bridge to the southern line of the county were commenced and prosecuted under the Act of March 25th, 1868, (Stats. 1867–8, p. 283) the sixth section of which provides that when the damages have been ascertained and apportioned to the townships through which the road is located, it shall be the duty of the Clerk of the Board to transmit a certified copy of the order to the Clerk of the Board of Trustees of the several townships, and it shall be the duty of the trustees at their first meeting to draw a warrant in favor of the Clerk of the Board of Supervisors upon the Road Fund of the township and cause the same to be paid and the money to be transmitted to the Clerk of the Board of Supervisors to be by him paid to the parties entitled thereto, "provided there is sufficient funds in the Township Treasury applicable thereto; if there are not sufficient funds in the Township Treasury applicable to the payment thereof, then said warrant shall be registered by the Township Treasurer and paid as other warrants are, subject to all laws applicable to the payment of demands against the township." The same section further provides that "no road shall be opened under the provisions of this act, until all damages have been paid to the parties entitled thereto, or have been deposited with the Clerk

of the Board of Supervisors, and to be paid by him as afore-
said." There was no proof at the trial that the damages
awarded to Clark & Coburn for the opening of this road had
ever been paid to them or either of them, or had been deposited
with the Clerk of the Board of Supervisors; and, in the ab-
sence of proof on that point, if it can be presumed that all the
officers did their duty in the premises, there can be no presump-
tion that there were any funds in the Township Treasury appli-
cable to the payment of the damages; and as the statute de-
clares that the road shall not be opened until the damages are
paid, or deposited with the Clerk of the Board of Supervisors,
it is clear that the Court was justified in holding that the dam-
ages had not been paid or deposited with the Clerk, and conse-
quently that the road was not legally established. We are not
called upon in this case to decide whether in a proceeding to
condemn private property for public use a deposit with the
Clerk of the Court of the sum awarded as damages would be
equivalent to payment.

The proceedings for the establishment of the other two roads
were had under the same statute as amended by the Act of
March 19th, 1872, (Statutes 1871–72, p. 427) and the amend-
ment retained precisely the same provisions for the payment of
the damages as were in the original act, with the same condition
that the road should not be established until the damages had
been paid or deposited with the Clerk.

At the trial evidence was introduced by the defendants tend-
ing to prove that when the damages for the opening of these
two roads had been ascertained, and awarded to Clark &
Coburn, one J. P. Ames delivered to the Clerk of the Board of
Supervisors his order on a mercantile firm for a sum of money
which was deemed sufficient to cover the damages and costs,
with directions to collect the money and pay it to Clark &
Coburn; but instead of collecting the money, the Clerk retained
the order in his possession for some time, and then delivered it
to Coburn. It does not appear that Coburn had authority to
receive the damages awarded to Clark; but if he had, he testi-
fied at the trial that Ames was indebted to him for a cost bill
growing out of a previous litigation, to an amount about equal

to that specified in the order, and that when he received the order from the Clerk it was his understanding that the order was intended to satisfy the cost bill, and was accepted by him for that purpose only, and not in satisfaction of the damages awarded to Clark & Coburn. On this state of the evidence we cannot disturb the finding to the effect that the damages were not paid or deposited with the Clerk, and not having been so paid or deposited, the Court below properly held as a conclusion of law that the roads were not legally established. But the Court further finds that the said pretended highways, or a great portion thereof, have been habitually used by the defendants, Ames & Templeton, for the storage of merchandise for their private emolument. In effect, the finding is that Ames & Templeton took the exclusive possession of the alleged highways, and used them for the storage of merchandise, thereby excluding the public from the use of them as public highways. Even though it be conceded that they were legally established as public highways, the defendants had no authority in law to appropriate them to their exclusive use and dominion to the exclusion of the public. In doing so they were trespassers, and in such cases it is well settled that the owner of the fee may maintain ejectment. He is entitled to the possession subject to the public easement, and may not only maintain ejectment against an intruder who takes possession of the highway, but if he suffers a special damage from the obstruction beyond that suffered by the public, he may maintain an action for damages, and to abate the nuisance.

In respect to the wharf and chute below high-water mark, the plaintiff rests his alleged right of recovery on several grounds. He contends, first, that the proceedings before the Board of Supervisors, which, it is claimed, authorized the erection of the wharf and chute, were inoperative in law for that purpose; second, that they were erected during the pendency of the lease, by or with the consent of the lessees, and that they constitute "improvements" which, by the terms of the lease, were to be surrendered to the lessor at the expiration of the term; third, that they were "affixed" to the land, and became a part of the real estate within the meaning of sec. 660 of the Civil Code, or

became "incidental or appurtenant" to the land within the meaning of sec. 662 of the same Code; fourth, that the plaintiff as a riparian owner is entitled to wharf out to deep water, and as a necessary incident to that right is entitled to the possession of the land covered with water in front of his premises.

Under the first point we deem it unnecessary, for the purposes of this decision, to determine what was the legal effect of the proceedings before the Board of Supervisors, and shall assume, for our present purpose, that they were inoperative in law to authorize the erection of the wharf and chute. In considering the second point, we shall assume that the wharf and chute were erected with the consent of the lessees Goodall & Nelson, as the Court finds they were. The lease provides that at the expiration of the term the lessee would surrender to the lessor the demised premises, "with such improvements as shall have been erected or made thereon, in good order, repair, and condition." But the wharf and chute are not on the demised premises; and, as will be hereafter seen, were not affixed or appurtenant thereto within the meaning of secs. 660 and 662 of the Civil Code. They were, therefore, not "improvements" within the terms of the lease.

Moreover, the case shows that the wharf and chute were not erected by the lessees, but by Ames & Templeton, who were strangers to the lease, and not bound by its covenants—being erected and operated by them for their own advantage, and not being on or affixed to or appurtenant to the demised premises, they are not "improvements" within the meaning of the lease.

Nor were they "affixed" to the land within the meaning of sec. 660 of the Civil Code, which provides that "a thing is deemed to be affixed to land when it is * * * embedded in it, as in the case of walls, or permanently resting on it, as in the case of buildings; or permanently attached to what is thus permanent, as by means of cement, plaster, nails, bolts, or screws."

In considering this point, we shall disregard the fact that before the commencement of the action the wharf and chute had been nominally severed from the remainder of the structure by running a saw through the boards at a point at or near high-

water mark; and shall treat the structure as though it had re-
mained intact, and had not been severed by sawing across it.
The argument for the plaintiff is that the structure, from the
point at which it leaves the plaintiff's land to its terminus in
deep water, must be deemed one structure; and as it is all
fastened together with nails, bolts, and screws, and its land-end
is embedded in or permanently resting on the soil, it comes
fully within the definition of sec. 660 as to things which are
deemed to be "affixed to land." But this view is not tenable.
It is not pretended that the wharf and chute below high-water
mark are "embedded" in the plaintiff's land, "as in the case
of walls; or permanently resting on it, as in the case of build-
ings." On the contrary, they rest upon piles driven into the
bed of the ocean. Nor are they "permanently attached to
what is thus permanent" in the sense of the statute. Assum-
ing that the land-end of the structure rests upon and is embedded
in the plaintiff's land, and that the portion of it which is below
high-water mark is attached to the other by nails, bolts, and
screws, the fact remains that it rests upon piles driven into the
bed of the ocean, and it is to this land, and not to the plaintiff's,
that it is affixed. On the plaintiff's theory, if a building be
erected partly on the land of one proprietor and partly on that
of another, either might maintain ejectment against the other
for the whole building, and any construction of the statute
which would result in such a solecism must be rejected. Nor
are the wharf and chute below high-water mark "incidental
or appurtenant" to the plaintiff's land within the meaning of
sec. 662 of the Civil Code, which provides that "a thing is
deemed to be incidental or appurtenant to land when it is by
right used with the land for its benefit; as in the case of a way,
or of a passage for light, air, or heat from or across the land of
another." If it be assumed that this section refers to any other
than incorporeal hereditaments, it cannot be said that the wharf
and chute erected by a stranger to the title are "by right used
with the land for its benefit."

The plaintiff, however, contends that, being a riparian owner,
he was entitled to wharf out to deep water in front of his land;
and as incidental thereto that he has such a right to the posses-

sion below low-water mark as will maintain ejectment.   We find it unnecessary to decide in the present case to what extent, if at all, and under what conditions, if any, a riparian owner is entitled, at common law, to wharf out to deep water; nor do we deem it material to determine whether Ames & Templeton acquired a valid right to construct the wharf and chute, in virtue of the proceedings before the Board of Supervisors. For our present purpose, we shall assume that the proceedings were null and void, and conferred no right to construct the wharf and chute, and shall further assume that the plaintiff, as a riparian owner, is entitled to wharf out to deep water. This brings us to the question whether, on these assumptions, the plaintiff has such a right to the possession of the land below low-water mark as will enable him to maintain ejectment.

We have been referred to no authority which supports the affirmative of this proposition, nor can it be maintained on principle.   It is well settled in England that the *title* in the bed of the ocean is in the sovereign, subject to the *jus publicum*— the right of navigation and fishery—of which the public cannot be deprived.   In this country, where the people are sovereign, the *title* to the bed of the ocean is in the State, which represents the sovereign power; and if obstructions are erected which materially impair the public right of navigation and fishery, they may be abated as public nuisances.   But all encroachments on navigable tide-waters are not necessarily public nuisances.   They may be of such a nature as not to obstruct the public right of navigation and fishery; and in that event the encroachment is what the law terms a *purpresture*—an unlawful intrusion upon the bed of the ocean, the *title* to which is in the sovereign.   In such cases, it is for the sovereign authority to decide whether the public good requires that the obstruction be removed.   In *People* v. *Davidson*, 30 Cal. 389, Mr. Justice SHAFTER, speaking for the Court, said:  " If the soil in this case belongs to the State—and such is the theory of the bill—then the wharf, if erected, will belong to it also.   The defendants will be unable to collect wharfage, and will have no rights except those belonging to the public at large.   Possession of the land and wharf, should it be withheld, *can be recovered*

*in ejectment*, and thereafter the wharf can be managed by the State according to its own views of public good."

It seems clear from this authority, and on principle as well, that in a case where no question of riparian rights intervenes, the State may maintain ejectment for a wharf constructed without authority of law, in navigable tide-water below the line of low water. If there be, however, a riparian owner, in front of whose land the wharf is erected, (as in this case) the question arises whether the right of action for the possession is in him or in the State. It cannot be in both at the same time. Assuming as we do, for the purposes of this decision, that the riparian owner is entitled to wharf out to deep water, it is clear, we think, that this right is in the nature of a franchise or privilege, to be exercised or not by him at his election. He may never see fit to avail himself of the privilege ; and it cannot be pretended that while declining to avail himself of his right to wharf out, he is, nevertheless, entitled to the possession of the land below high-water mark, on the theory that at some future time he may possibly change his mind and desire to erect a wharf. On this theory he might capriciously refuse to erect a wharf at a point where the convenience of commerce demands it, and might prevent others indefinitely from engaging in the enterprise. A theory which works this result cannot and ought not to be upheld. On the contrary, giving to this right of the riparian owner its widest scope and latitude, it amounts only to this : that if he desires to wharf out, and is unlawfully obstructed in the exercise of the right, he may maintain an action for damages ; and if the obstruction amounts to a public nuisance, it may be abated by appropriate proceedings for that purpose. If it be only a private nuisance which obstructs him in the exercise of his right to wharf out, he may possibly cause it to be abated by the appropriate method. But he has no such title or right to the possession of the bed of the ocean as will enable him to maintain ejectment. In this State, there are numerous large landed estates, held in private ownership, which front for many miles on the shore of the ocean, and on navigable bays and inlets within the ebb and flow of the tide ; and if the doctrine were tolerated that each of these proprietors, while himself

declining to erect and maintain the docks, piers, and wharves which are necessary for the convenience of commerce, nevertheless, in virtue merely of his riparian rights, might maintain ejectments for all such structures erected by others, which, when recovered, he might either demolish or cease to use in aid of commerce, it is not difficult to foresee the disastrous consequences which would result from such a doctrine. It results from these views that the Court below erred in including in the judgment for the plaintiff the wharf and chute below high-water mark.

It is therefore ordered that the judgment be and is hereby modified, by striking therefrom so much thereof as includes the wharf and chute below the line of high water, and in other respects the judgment is affirmed.

Mr. Chief Justice WALLACE did not express an opinion.